## 20081

Dora LUREY, by her Attorney in Fact, Esther L. Ginsberg, Appellant,
v. The CITY OF LAURENS, Respondent

(217 S. E. (2d) 226)

*Messrs. Townsend & Thompson,* of Laurens, *for Appellant,* cite:

*Wyatt Saunders, Jr., Esq.,* of Laurens, *for Respondent,* cites:

August 7, 1975.

BRAILSFORD, Acting Associate Justice:

This is an appeal from an order of the circuit court which sustained a 1974 amendment to the 1961 zoning ordinance of the City of Laurens upon the grounds that the extension

of the P-1 district did not constitute impermissible spot zoning, was not arbitrary or unreasonable, and that the presumption of adoption in the public interest had not been overcome. The opinion of Justice Ness would reverse upon the ground that in adopting the amendment City Council not only acted unreasonably and arbitrary but with the intention of catering to a private group. Being convinced that these inferences are not fairly supported by the record, we disagree.

When the 1961 zoning ordinance was adopted by the City, this area was exclusively residential except for a hospital and two doctors' offices contiguous to it at the corner of Farley Avenue and Owings Street. The zoning ordinance conformed to these existing uses by placing the hospital and offices in Class P-1, professional, and the surrounding area in R-12, residential.

After the adoption of the ordinance and before 1973, the City's offer of a site on which to construct a new hospital outside of the residential area was rejected. Instead, at a cost of about one million dollars, the old hospital was rebuilt and, inferentially, greatly enlarged. This expenditure virtually committed the community to expansion of related medical facilities in the hospital area, for which inadequate provision had been made by the original zoning ordinance.

When Glenn Batten & Associates, a landuse consulting firm, was employed by the City to make a comprehensive study of its zoning structure, this need was immediately recognized. Batten estimated that eventually an additional ten acres would be required. He called the problem to the attention of the zoning administrator and members of the Planning and Zoning Commission orally and by two written reports. This was recognized by all concerned as a weighty problem calling for controversial decisions as to the direction or directions in which the P-1 district should be expanded and the extent of such expansion. However, a draft of a recommended revision of the zoning ordinance submitted by Batten in June of 1973 failed to include an exten-

sion of the P-1 area. Since the proposal was merely a recommendation and there is no serious dispute that additional area is required, Batten's reasons for this omission need not be stated. Suffice it to say that they are at least arguably credible.

The amendment does not create a new P-1 district in the residential area. It merely extends the existing district to meet a public need for expansion of the hospital area. The record indicates that the choice of direction and of the property to be included was made deliberately and in full compliance with the statute. We find no basis for concluding that a more appropriate choice was available, certainly none for overturning the strong presumption that the legislative power was exercised lawfully and in the public interest.

This opinion having been concurred in by a majority of the Court becomes its judgment.

Affirmed.

Moss, C. J., and LEWIS, J., concur.

LITTLEJOHN and NESS, JJ., dissent.

NESS, Justice (dissenting):

This opinion was proposed to the Court as the proper disposition of the issues before us. A majority of the Court having now elected to affirm the case, I file my proposed opinion in the form of a dissenting opinion, setting forth my views as the more appropriate disposition of the case.

This is an appeal from an amendment to the City of Laurens Zoning Plan. The City first adopted a zoning plan in 1961 and is presently governed by that plan, as modified over the years. The current controversy concerns a 1974 amendment to this plan.

In the early spring of 1974 a physician completing his residency in Greenville obtained an option to purchase a lot in an area zoned R-12 (Residential District). The physician intended to move to Laurens and erect on this lot an office for his medical practice. He petitioned the Zoning

Commission to amend the zoning of this lot to P-1 (Professional District). The Commission considered his request and expanded the area to be rezoned so as to include seven other contiguous lots. These lots were all in the center of an R-12 district, comprising a portion of two blocks (but not a single complete block) and fronting on two streets. Despite protests, this amendment was approved by the Zoning Commission and adopted by the City Council. An appeal was perfected to the Circuit Judge who ruled in favor of the City.

The parties agree that the City complied with all the necessary procedural requirements. The evidence unquestionably indicates that the entire area is residential, subject to a nonconforming use, a beauty shop operated in a residence; the County Hospital which is zoned Professional; and two modern doctors' offices adjacent to the Hospital which are either zoned Professional or Residential, the record being unclear. Finally, it is undisputed that the residential area is one of Lauren's most attractive, and that the amendment has adversely affected the value of the residential homes and at the same time inflated the value of the rezoned lots.

The appellant raises several questions, the essence of which is that the City has acted arbitrarily and unreasonably, exceeding its statutory authority, and that this has resulted in the denial to the appellant of due process of law and equal protection of the law under both the federal and state constitutions. We agree.

The authority to enact zoning ordinances is conferred upon municipalities by statute. S. S. Code, 47-1001 *et seq.* and 14-341 *et seq.* The grant is premised upon the police power of the State and its objectives are set forth in the statute. *Id.; Wells v. Finley,* 260 S. C. 291, 195 S. E. (2d) 623 (1973). Because zoning is a legislative act, it will not be interfered with unless there is a clear violation of the constitutional rights of citizens. Accordingly, in order to

successfully assault the zoning decision, the petitioner must establish that the decision was arbitrary and unreasonable. *Byrd, et al. v. City of North Augusta,* 261 S. C. 591, 201 S. E. (2d) 744 (1974).

This policy of judicial restraint has constitutional overtones for our state constitution mandates adherence to the doctrine of separation of powers. S. C. Const., Art. 1, § 8. *Cf., Bussey, A. J., Casey v. South Carolina State Housing Authority, et al.,* S. C., 215 S. E. (2d) 184, filed May 2, 1975. Hence, the Court cannot casually insinuate itself into the legislative process. Other sound reasons oblige judicial restraint. Any zoning plan encompasses multifarious considerations. Local governing bodies are better equipped with their knowledge and flexibility to respond to local needs. Thus, the normal rule is that "the power to declare an ordinance invalid because it is so unreasonable as to impair or destroy constitutional rights in one which will be exercised carefully and cautiously, as it is not the function of the Court to pass upon the wisdom or expediency of municipal ordinances or regulations." *Rush v. City of Greenville,* 246 S. C. 268, 276, 143 S. E. (2d) 527, 531 (1965); *Bob Jones University, Inc. v. City of Greenville,* 243 S. C. 351, 133 S. E. (2d) 843 (1963).

However, the above does not suggest that this Court should abdicate its obligation to closely scrutinize legitimate constitutional questions.

In the instant case the amendment is invalid for three reasons which, when viewed in combination, clearly established that the City acted arbitrarily and unreasonably in violation of the appellant's constitutional right of equal protection of the law:

(1) An existing cohesive residential area was disrupted by the rezoning of only a portion of the district and the remaining area of the district is indistinguishable from the rezoned area.

Citizens owning land of undiscernible differences are entitled to be treated equally, for the government cannot benefit

one person and arbitrarily deprive another. *Talbot v. Myrtle Beach Board of Adjustment, et al.*, 222 S. C. 165, 72 S. E. (2d) 66 (1952). How can it be contended that the amendment involved satisfies this requirement? The City has not offered any legitimate criteria for distinguishing the area rezoned from the surrounding lots. The eight lots were wrenched from the center of a homogeneous expanse of family dwellings. That these lots were wrested from existing residential tranquility is best illustrated by viewing the revised tax map. The new P-1 district is encapsulated by the remaining residences with the exception, of course, of the non-conforming beauty parlor; the Hospital and two doctors' offices located in the adjacent block. It is asserted that the amendment is an extension of an existing professional district; however, the professional district, at most, consists of only three lots, amounting to less than half of a block, and apparently was zoned Professional because the Hospital and two doctors' offices were existing when the City was originally zoned. The stipulation of the parties fully supports the conclusion that the area is predominately residential. The stipulation states that "[a]ll areas surrounding the Hospital are zoned R-12 Residential and are essentially residential in use."

This fragmenting of the existing district has resulted in the P-1 lots increasing in value, but only at the expense of the residentially zoned houses which have declined in value. The City cannot, without justification, strip an integral portion of a cohesive residential area and adversely affect the remainder of the district. Under the amendment the owners of residential property cannot take advantage of the less stringent P-1 restrictions and employ the land to its fullest use. Moreover, the unamended portion of the district will no longer be conducive to the purpose for which it is still zoned—residential—due to the impending swell of traffic and congestion and the omnipresence of noise which necessarily attends professional—institutional zones. See *Burkett v. City of Texarkana*, 500 S. W. (2d) 242 (Tex. Civ. App.

1973); *Jaffe v. City of Davenport,* 179 N. W. (2d) 554, 556 (Iowa 1970); *Bosse v. City of Portsmouth,* 107 N. H. 523, 226 A. (2d) 99, 105 (1967); *Appeal of Mulac,* 418 Pa. 207, 210 A. (2d) 275, 277 (1965); *Willott v. Village of Beachwood,* 175 Ohio St. 557, 197 N. E. (2d) 201 (1964).

(2) The decision to amend was based exclusively on the proposed use of the rezoned land by the petitioner and others in his profession in contradistinction to the permissible uses under the zoning amendment.

Another factor which fortifies the appellant's position is that the City's decision to rezone was obviously dictated by the sole consideration of rezoning lots for doctors' offices or adjunctive medical uses and not for the wide range of permissible uses under the P-1 classification. When the legislative motivation for adopting the amendment appears upon the face of the record, it is proper for us to consider it. *DeSena v. Gulde,* 24 A. D. (2d) 165, 265 N. Y. S. (2d) 239, 246 (1965); *Kissinger v. City of Los Angeles,* 161 Cal. App. (2d) 454, 327 P. (2d) 10 (1958).

Mr. Glenn Batten, president of a consulting firm which was paid Twenty Thousand ($20,000.00) Dollars in 1973 to conduct a study and recommend a comprehensive revision of the zoning ordinance, advised the City concerning this particular amendment. He testified that only a small area (about five acres) was to be rezoned at the present time and that the purpose of such a small area was "to limit this area to medical center uses to the greatest extent possible." He noted that "if it is the desire to expand the hospital facility itself and adjacent property were re-zoned immediately for professional offices then it would be very possible for someone to come in and build a building that would house a real estate firm or looking at the present ordinances you could build a funeral home or a museum or a number of different uses that would be non-medically related." Hence, the sole basis for the proposal of just a few acres was to restrict the area to medical uses even though Mr. Batten stated, "you

cannot have a district so restrictive that it would permit only medical associated uses." In other words, the City was attempting to do indirectly what it thought it could not do directly.

This approach to zoning administration is not permissible. The amendment was not designed to facilitate orderly growth pursuant to a comprehensive plan. It merely relieved certain property from more restrictive zoning regulations. S. C. Code, § 47-1003; *Clark v. City of Boulder,* 146 Colo. 526, 362 P. (2d) 160 (1961); *Borough of Cresskill v. Borough of Dumont.* 15 N. J. 238, 104 A. (2d) 441 (1954). The purpose was to promote the interest of a select group of private persons to the disadvantage of the public who is entitled to be able to rely on orderly development. *Bosse v. City of Portsmouth, supra; Damick v. Planning and Zoning Commission,* 158 Comm. 78, 256 A. (2d) 428, 430 (1969); *Anderson v. City of Seattle,* 64 Wash. (2d) 198, 390 P. (2d) 994 (1964); *Grant v. McCullough,* 196 Tenn. 671, 270 S. W. (2d) 317 (1954).

The specialized treatment accorded the establishment of doctors' offices illustrates the arbitrariness of the City's decision. The City remained oblivious to other permissible uses that may result under the general classification. While we do not have a copy of the present zoning ordinance, Mr. Batten's own testimony reveals some of the uses permitted. Under the Batten proposal from the 1973 report the following uses, among others, are allowable: "offices rendering professional services including legal, medical, dental, architectural, engineering, planning, accounting, and similar services; offices rendering specialized business services including real estate, insurance, advertising, finance, brokerage, stenographic, telephone answering; offices of governmental agencies . . ."

Under the facts here these uses are objectively incompatible with this residential area. The traffic congestion which inevitably results from these uses would adversely affect the safety of children in the streets, Yet, if the amendment is to

be sustained, it must be reasonably calculated to promote the health, safety, and welfare of the community. S. C. Code, § 47-1001.

The fact that the City was hoping that aesthetically harmonious medical facilities would result from the amendment does not cure the defect. In *City of Florence v. Turbeville*, 239 S. 'C. 126, 121 S. E. (2d) 437 (1961) the appellant sought to dissolve an injunction prohibiting the operation of a dancing school in his home because it was "carried on in an orderly fashion and was not objectionable to many persons living in the zone." *Id.* p. 136, 121 S. E. (2d) p. 442. This Court held that "to allow the intrusion of commercial enterprises into residential areas opens the gates to further intrusions and eventually will cause a breakdown of the whole scheme." *Id.* p. 136, 121 S. E. (2d) p. 442.

(3) The City displayed an ulterior motive in reclassifying certain lots to the exclusion of other lots which continued to be more severely restricted.

The appellant's contentions are further buttressed by the fact that an area immediately west of the County Hospital, which is *part of this same residential neighborhood, is* indistinguishable from the rezoned lots. The justification for the differential treatment was that at some time in the future the County Hospital may need to expand.

For insance, Mr. Batten had originally proposed including an area to both the east and west to be reclassified. In this connection he testified as follows:

"Yes, I changed my mind about extending to the west because I, *upon examining it and upon discussion with the members of the planning board, I thought they had a very* valid point in that the area to the west and immediately adjoining the hospital property itself is the most logical to be used in the future and should be held in the future for expansion of the hospital facility itself and that to re-zone let's say, parcel 7 which adjoins the hospital at this time might encourage or might possibly bring about the development of that parcel so that it would limit future expansion of the

hospital facility itself. *So I think that the planning intention now is that the area to the west of the hospial should be preserved for expansion of the hospital facility itself."* (Emphasis added.)

Furthermore, Mr. Batten was asked: "Who conveyed to you that the hospital didn't want to open that area up and that they wanted it so that they could get it eventually?" He replied: "This was the opinion of the, of several members of the planning board. I believe that Mr. Culbertson (Edsel Culbertson, chairman of the planning board) was one who made this suggestion." Mr. Batten's testimony is fully supported by the testimony of members of the planning commission.

It was contended by respondent that the area west of the Hospital is well suited for future expansion. However, the City cannot restrictively classify an area to prevent development merely so it or another governmental body will be able to later condemn the land for its own use, presumably at reduced cost. *Kissinger v. City of Los Angeles, supra;* 1 Nichols on Eminent Domain, § 1.42(10), p. 1-221 (Rev. [3rd] Ed. 1974).

The City was presented with a difficult situation. Apparently there is no available land in the proximity of the County Hospital for doctors to locate their offices. We do not question the desirability of having doctors' offices near a central medical facility, nor, under a proper showing and appropriate rezoning that the City may provide for such a need; however, when the City adopted the amendment converting the district to P-1, it was obviously catering to the desires of a private group and not facilitating orderly development pursuant to a comprehensive plan.

These alleged needs cannot justify the unequal treatment of property owners which would result under the current plan.

Accordingly, I would,

Reverse.

LITTLEJOHN, J., concurs.